**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

17-CR-6089 DGL

**UNITED STATES OF AMERICA**

**DEFENDANT'S SENTENCING**
**STATEMENT AND REQUEST**
**FOR A NON-GUIDELINE**
**SENTENCE**

v.

**Craig Jerabeck,**

**Defendant.**

---

JAMES NOBLES, ESQ., affirms as follows:

I.      I am an attorney licensed to practice law in the State of New York and the United States District Court for the Western District of New York, and I represent **Craig Jerabeck**.

2.      I make this affirmation pursuant to the requirements of Section 6A1.2 of the Sentencing Guidelines and Rule 32(f) of the Federal Rules of Criminal Procedure.

3.      In accordance with those rules, I have reviewed the Pre-sentence Investigation Report dated **September 24, 2018** (hereinafter the "PSR"), and have discussed it with my client. The Defense filed an **Objection to the Presentence Investigation Report** on **October 9, 2018** with respect to the overbroad and unsubstantiated information contained therein.

4.      The representations made in this Sentencing Memorandum are based on the PSR, conversations with Mr. Jerabeck and others, and the following exhibits:

**Exhibit A:**     Statement of Craig Jerabeck;

Exhibit B:      Letters from:

1. John G. Doyle, Jr., President and CEO of a local business and longtime friend, dated September 14, 2018;

2. Robin Hoffman, longtime employee of Mr. Jerabeck, dated September 18, 2018;

3. Michael Weiner, friend and business associate, dated October 3, 2018;

4. Jeff Parness, friend and colleague, dated May 16, 2018;

5. Craig Jerabeck, Jr., son, undated;

6. Cornelia M. Reeves, colleague, undated;

7. Andrew Behe, employee, dated October 4, 2018;

8. Vinson Montgomery, colleague, dated October 5, 2018;

9. John J. Marchaesi, colleague and friend for three decades, dated September 16, 2018;

10. Jamie Trovato, friend and colleague, undated;

11. Kraig Kayser, President and CEO of Seneca Foods Corporation, and friend for over 15 years, dated September 14, 2018;

12. Carl Steinbrenner, friend and business associate, dated October 5, 2018;

13. Elizabeth Watson, daughter, dated October 4, 2018;

14. Katherine Jerabeck, daughter, dated October 11, 2018.

**Exhibit C:**   Craig Jerabeck's LinkedIn biography;

**Exhibit D:**   5Linx media;

**Exhibit E:**   5Linx charitable giving media;

**Exhibit F:**   New York State Common Retirement Fund investment in 5Linx articles.

## INTRODUCTION

5.     Craig Jerabeck pled guilty to Count 1 and Count 2 of the Superseding Indictment, respectively charging 18 U.S.C. 1349, Conspiracy to Commit Wire Fraud, and 26 U.S.C. 7206 (1), Filing a False Tax Return for the year 2014.

6.     Sentencing is currently scheduled for Thursday, November 1, 2018, at 10 a.m.

## SENTENCING STATEMENT

7.     The government and the defendant agree that Guidelines §§ 2B1.1(a) apply to the offense of conviction and provide for a base offense level of 7. The government and the defendant further agree that three specific offense characteristics apply: a) USSG §2B1.1(b)(1)(I): the total loss was in excess of $1,500,000, and thus there is a 16 offense level increase; b) USSG §2B1.1(b)(10)(C): offense involved sophisticated means, 2 level increase; and c) USSG §3B1.3: abuse of trust/special skill, 2 level upward adjustment, resulting in an adjusted offense level of 27. The government agrees not to oppose the application of the two (2) level downward adjustment for Guidelines § 3E1.1(a) (acceptance of responsibility) and agrees to move the Court to apply the additional one (1) level downward adjustment of Guidelines §3E1.1(b), resulting in a total offense level of 24 (PSR, Paragraphs 27-24).

8.     Based upon a total offense level of 24 and a criminal history category of I, the guideline imprisonment range is 51 to 63 months (PSR, Paragraph 31).

9.     Paragraph 12 of the Plea Agreement states the original sentencing guideline range for Mr. Jerabeck was agreed upon at a range of 51 to 63 months. However, the Defendant also engaged in a USSG §5K1.1 agreement through which the

Government has outlined in their letter dated October 10, 2018 that they are moving for a reduction under the USSG §5K1.1 provision and recommending a two (2) level downward reduction resulting in a reduced guideline range. Per the plea agreement, the Defense is specifically allowed to recommend sentencing outside the guideline range, and intends to do so. We also believe the reduction should be more significant than the two (2) levels stated in Assistant U.S. Attorney Resnick's letter. Any downward departure should reflect the nature and length of the case, the Defendant's plea, and the crucial role he played in getting his codefendants to plea. This saved the government and the Court from a lengthy and expensive trial. Those pleas would likely not have happened without the Defendant's cooperation and the codefendants' knowledge of it. Furthermore, the Defendant cooperated extensively in the forfeiture and sale of his primary residence, producing over $500,000 towards restitution.

10.     Under 18 U.S.C. § 3553(a), federal sentencing courts must impose a sentence that is **sufficient, but not greater than necessary,** to meet the purposes of sentencing.[1] This includes the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid sentencing disparities between defendants with comparable criminal records who have been convicted of similar

---

[1] The purposes of sentencing are identified as:
    The need for the sentence imposed -
        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B)    to afford adequate deterrence to criminal conduct;
        (C)    to protect the public from further crimes of the defendant; and
        (D)    to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.
                                                  18 U.S.C. § 3553(a)(2).

crimes, and the Guidelines themselves. See *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010).

11.    The "sufficient, but not greater than necessary" language of § 3553 is commonly referred to as the "parsimony clause." See *United States v. Williams*, 475 F. 3d 468, 476 (2d Cir. 2007), cert. denied, 552 U.S. 1105 (2008). When imposing sentence, the district court must consider the factors mentioned in § 3553(a), including the requirements of the parsimony clause. *Id.* **Simply stated, if the district court concludes that either of two sentences would properly serve the statutory purposes of § 3553(a), application of the parsimony clause compels imposition of the lesser sentence**. See *United States v. Ministro-Tapia*, 470 F.3d 137,142 (2d Cir. 2006).

12.    The sentencing court must also consider the advisory Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220,245-246 (2005). However, "[e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the § 3553(a) sentencing factors." *United States v. Dorvee*, 616 F.3d at 182 (citing *United States v. Cavera*, 550 F.3d 180,189 (2d Cir. 2008), cert. denied 129 S. Ct. 2735 (2009)).

13.    The importance of individualized sentencing is a central theme in federal criminal law:

> It has been uniform and constant in the
> federal judicial tradition for the sentencing
> judge to consider every convicted person as an
> individual and every case as a unique study in
> the human failings that sometimes mitigate,
> and sometimes magnify, the crime and the

punishment to ensue.

*Koon v. United States*, 518 U.S. 81,113 (1996).

14.     In *Kimbrough v. United States*, the Supreme Court reminded the district courts that:

> The sentencing judge ... has greater familiarity with ... the individual case and the individual defendant before him than the Commission or the appeals court. . .. He is therefore in a superior position to find facts and judge their import under § [3553(a)] in each particular case.
>
> *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (internal quotations omitted).

## THE 5Linx SAGA

15.     Although much of this information is contained in Mr. Jerabeck's letter to the Court, the information in this section of the Memorandum is based upon the Defense's review of the discovery and independent investigation of the facts and circumstances of this case.

16.     In 2001, Craig Jerabeck (Jerabeck), Jeb Tyler (Tyler), and Jason Guck (Guck) (collectively, the "Founders") founded 5Linx Enterprise, Inc. (the "Company" or "5Linx"), a multilevel marketing company headquartered in Rochester, New York. 5Linx began as a telecommunications services company and grew to offer utility services, health insurance, coffee, nutritional supplements, and business services, amongst other products.

17.     From 2001 through mid-2015, Jerabeck was President and CEO of 5Linx; Guck was Vice President and Secretary; and Tyler was Vice President and Treasurer

(**Exhibit C**, Craig Jerabeck's professional biography). At all times, 5Linx had stockholders outside of the Founders.

18.    5Linx used independent representatives to sell products and services, and to recruit representatives. The recruited representatives were part of the initial representative's "downline" organization. All 5Linx representatives were independent contractors, not employees. 5Linx paid the representatives for their sales. In addition to the representatives, 5Linx had more than 235 employees in Monroe County at its peak; these positions inside the Company included IT, customer service, billing, management, marketing, etc.

19.    On June 23, 2006, 5Linx entered into a Stock Purchase Agreement with Trillium Lakefront Partners and Shalam Investment Co., L.L.C. (collectively, the "Investors"). The Investors paid $3,500,000 for stock and a minority ownership stake in 5Linx.

20.    On July 6, 2007, 5Linx and the Investors entered into a second Stock Purchase Agreement. The Investors paid $2,000,000 for additional stock and a slightly larger ownership stake in 5Linx. The Investors' ownership stake did not exceed 23%, even after both investment rounds. The three Founders at all times owned at least 70% of the Company.

21.    The case against 5Linx began when a disgruntled former representative demanded ownership in the Company and was denied. The representative, Andre Maronian, who was earning $55,000 per month while with 5Linx, wanted more. He'd already lost several civil lawsuits against 5Linx, then fabricated events to key venture capital investors. The Shalam and Trillium Creditors (formerly the Investors) were in a

bid to take over the Company and dismissed Maronian. Maronian, unsatisfied with this result, continued with attempts to publicly damage the Company. Doing this ensured 5Linx's uphill battle in repaying the Note to the Creditors, 5Linx lost many of the Company's representatives, and revenue plummeted. Maronian ultimately went to the FBI and the U.S. Attorney's Office.

22.     In 2013, the Investors were offered $16.5 million and 10% of the Company's stock as a buyout on their $5.5 million investment. The Investors rejected the offer and attempted to squeeze an additional $6 million from the Company. The Investors were never entitled to $22 million, as alleged. But they refused to sell for any less. There were clear success measurements and payouts laid out for the Investors which were based on performance targets. Based on Company performance and the lack of sale or IPO, the maximum return to the Investors would have fallen between 8-15% simple interest on their investment.

23.     In January 2014, the Investors pressed the Company for a buyout. The Investors had already received a $1 million dividend in a prior year and a cash payment of $11.2 million at the time of the sale. As part of the deal, all remaining shares were purchased from the Investors and 5Linx signed promissory notes (the "Notes") in which the Company agreed to pay the Investors an additional $10,000,000. The Investors became creditors (the "Creditors"). In short, the Investors were actually paid over $13 million on their initial $5.5 million venture investment.

24.     To expand and diversify outside telecom, 5Linx had expanded into the energy market when they acquired a deregulated electricity marketing company in 2013. Electricity customers were easily acquired and the future looked promising, that

is, until January 2014. For the first time in over half a century, a weather phenomenon known as a polar vortex hit the Northeastern United States and the electricity portion of the business suffered an enormous financial loss: approximately $7,000,000 cash loss in three months.

25.     A polar vortex is the circulation of strong, upper-level winds that normally surround the North Pole in a counterclockwise direction – a polar low-pressure system. These winds tend to keep the bitter cold arctic air locked in the Arctic regions of the Northern Hemisphere. On occasion, the vortex can become distorted and dip much farther south than usual, allowing frigid air to spill down. Unfortunately for 5Linx, this hit the United States during the winter of 2013/2014; the impact of this event on the U.S. economy has been estimated to have been $5 billion (*see* https://en.wikipedia.org/wiki/Early_2014_North_American_cold_wave). This extreme weather event sent costs soaring for utility companies, many of which couldn't handle the crisis. When challenges hit the market, energy companies cannot pass all of their unexpected increases in utility supply prices on to consumers, and many companies started to go under.

26.     At a time when many deregulated energy companies went out of business, Jerabeck managed to sell the energy portion of 5Linx to one of the suppliers for a loss at $1,000,000, and saved 5Linx from bankruptcy. It was the perfect storm, further burdening the Company's financial struggles, as this occurred after the Company had been locked into the Investors' buyout.

27.     In 2015, the Founders' independent representative positions were significantly reduced or eliminated from paying out commission as the Company was in a serious cash crisis, promoting the renegotiated Note with the Creditors. The structured

monthly Note payments of $250,000 were nearly unmanageable for the Company. Financial troubles continued, as recovering from the enormous loss was not easy. Subsequently, Bank of America called in the Company's $6 million line of credit due to the losses sustained in the Company's energy business, forcing the Company to sell off its telecom business, all while landline telephones were disappearing and cash was not coming in. 5Linx sold Globalinx in a fire sale for a mere $7 million, which allowed them to cover the $6 million line of credit.

28.     5Linx actually paid the Investors over $13 million on a $5.5 million investment, a 218% return. Of the numerous investments Trillium made in companies, 5Linx was by far one of the top returns of all their investments, even considering they did not get paid the $6 million remaining on the Note.

29.     Like the venture capital Investors, New York State took a risk with 5Linx and invested in the Company through their employee pension fund. According to New York State Comptroller Dinopoli, 5Linx paid New York State $6.7 million on an approximate $1.5 million investment from the New York State employee pension fund, a 600% return on investment (**Exhibit F**).

30.     It is worth noting that both Shalam and Trillium are venture capitalists. They chose to make the investment in 5Linx, which in and of itself was inherently risky. Venture funding is one of the riskiest investments to make, as it is unsecured and unregulated. Unlike other venture endeavors, the investment in 5Linx paid out exponentially, both for the State and Trillium and Shalam. According to an article in the Wall Street Journal, nationally, over 75% of all venture capital investments fail without return and produce a total loss of capital (https://www.wsj.com/articles/

SB100000872396390443720204578004980476429190). The Investors' risk in 5Linx paid

off with a 218% profit, even without the additional payments they were owed.

## HISTORY AND CHARACTERISTICS OF THE DEFENDANT

31.     Mr. Jerabeck is thankful for the overwhelming support of his family, friends,

and colleagues throughout this process and greatly regrets the trouble he has caused

them due to his actions. Attached to this statement are several character letters on

behalf of Mr. Jerabeck (**Exhibit B**), which describe an honest, hardworking, charitable

man who clearly is very dear to his family and all of those around him. They attest to

character, determination, perseverance, and remorse. Everyone who wrote a letter on

Mr. Jerabeck's behalf was aware of the crime he committed and the charges to which

he has pled guilty. They have written these letters to describe him as a man who is more

than the person who stands before the Court. He is also a father, a friend, a colleague,

and an integral part of his community.

32.     Some important descriptions of Mr. Jerabeck bear repeating in noting his

background and character: a devoted, loving and supportive father (**Exhibits B-1** Doyle,

**B-6** Reeves, **B-9** Marchaesi); a talented entrepreneur (**Exhibits B-1** Doyle, **B-12**

Steinbrenner); trusted mentor (**Exhibit B-6** Reeves); man of integrity (**Exhibit B-6**

Reeves); a cheerleader (**Exhibit B-11** Kayser); philanthropist (**Exhibit B-12**

Steinbrenner); extremely humble and generous (**Exhibit B-10** Trovato).

33.     Everyone consistently attests to Mr. Jerabeck's devotion to his family,

service to his community, generosity as an employer, and overall integrity and work

ethic. The letters describe a man who is consistent in all of his endeavors.

34.     Robin Hoffman shares how Mr. Jerabeck "took a chance" on her. When her twins arrived three months premature, Mr. Jerabeck "was sympathetic to my situation and was very understanding. After I delivered, he told me to go take care of my babies, take as much time as I needed, and my job would be waiting for me when I was ready to return. True to his word, four months later when I called him to tell him my babies finally came home from the hospital he gladly welcomed me back."

35.     Ms. Hoffman goes on to describe how she witnessed Mr. Jerabeck's compassion and generosity as an employer during times of their personal hardship, going as far as adding company-paid life insurance as a benefit for every employee in response to the tragic loss of an employee (**Exhibit B-2**).

36.     Kraig Kayser describes Mr. Jerabeck as "a person who has made a difference in thousands of people's lives by making their lives better...Craig Jerabeck has a long and demonstrated track record for making people happier and more successful. This is no easy job. He often did this at great personal sacrifice." (**Exhibit B-11**)

37.     Jamie Trovato describes Mr. Jerabeck as someone who, "gives back in so many ways. His charitable contributions are well documented." He credits Mr. Jerabeck for showing him "how a true professional acts." (**Exhibit B-10**)

38.     Michael Weiner writes, "I am truly glad I made that decision to work with Craig...I have found Craig to be a great asset to me personally and professionally... [he is] genuinely one of my favorite clients/business partners I have the pleasure to work with." (**Exhibit B-3**)

39.     Andrew Behe recounts Mr. Jerabeck's sullen demeanor following the sale of a division of 5Linx, not because he was upset with the terms of the transaction, but because so many of his employees would be let go. He captures the essence of Mr. Jerabeck: "In the 5 years I have known Craig, I have remained impressed by his compassion and desire to create jobs and opportunities not only in Rochester, but across this country. Craig has given tens of thousands of people not only a steady income, but hope that they can create a better future for themselves and their families, and this is the man and spirit I continue to respect." (**Exhibit B-7**)

40.     While his mistakes are acknowledged in the letters, they unanimously speak of a loyal, compassionate man who takes care of those around him, gives of himself, and perseveres time and again.

41.     The most moving letters came from his children. All three manage to capture the essence of an involved, supportive dad, who taught them the value of hard work, giving back, and family, each through their own individualized experiences with him. In the Jerabeck family, this was known as "special time" – time alone with dad and daughter or son, engaging in an activity that was uniquely theirs.

42.     Elizabeth, Mr. Jerabeck's oldest daughter, recants the time spent together getting coffee. Then as she got older and joined crew, her dad, "would come to all of our regattas and ride his bike along the entire route to watch." (**Exhibit B-13**)

43.     His son Craig, Jr. states, "I enjoyed an upbringing with parents who were always there, always available, and who love me unconditionally." He describes how his dad instilled the value of work in him. He didn't have to do it, but he needed to teach me the importance of hard work and spend time with his son. Surprisingly (or maybe not)

some of my best memories are from the worst jobs with my dad." This sentiment comes through in every letter submitted on behalf of Mr. Jerabeck. Craig Jr. writes further and sums his dad up best in seven simple words: "my dad is my hero and friend." (**Exhibit B-5**)

44.     Katherine, Mr. Jerabeck's youngest, describes her own favorite "special time" with her dad – making grilled cheese after dance. "Every night after dance, the rest of my family would be getting ready for bed, and Dad and I would eat grilled cheese for a second dinner together. We would try out new breads; debate mayonnaise vs. butter; dip it in different sauces; and pick our favorite sides (a pickle), all while talking about our days. Some days they turned out amazing, some days we burnt them; regardless, Dad and I sat at the kitchen counter and ate together." (**Exhibit B-14**)

45.     Mr. Trovato wisely states, "if you ever want to see what kind of parent someone is look at their children. Craig has the nicest most respectful children I have ever met. They are all extremely successful adults now." (**Exhibit B-10**)

46.     You can also see the remorse for the effect his actions have had on his family, and himself in terms of how his children describe the challenges their family has endured throughout their dad's case. Katherine writes, "The past few years have been difficult. Our family is strong; we have always been a team. But this has been a marathon for which none of us signed up. The most difficult aspect of this experience has been the discrepancy between my knowledge of my father, and the current case. My father once actually fell into the Erie Canal trying to retrieve a napkin that had fallen in because he had always taught us not to litter. This case and the media surrounding

my father is not the Craig Jerabeck that I have known for the past twenty-three years of my life." (**Exhibit B-14**)

47.    In addition to supporting his family and friends, Mr. Jerabeck has supported numerous charitable organizations both professionally and personally.

48.    Under Mr. Jerabeck's leadership, 5Linx made several significant charitable contributions both locally and nationally. These donations were in excess of $600,000. At every national convention, Mr. Jerabeck made sure funds were raised and matched by the Company in order to support a local charity. These include the Trayvon Martin Foundation, the Shine Family Foundation, Pediatric Cancer Foundation, Any Baby Can of San Antonio, St. Frances Academy, Urban Youth Impact, Inc., Young Entrepreneurs Academy, and Rochester Ventures Foundation, amongst many others (**Exhibit E**).

49.    On the personal side, Mr. Jerabeck freely gave of his time to many organizations, which include Strong Children's Hospital, the ARC of Monroe County, the National Center for Missing and Exploited Children, Catholic Charities, and the NY Says Thank You Foundation, amongst others. In her letter to the Court (**Exhibit B-13**), Mr. Jerabeck's oldest daughter, Elizabeth, recounts the impact volunteering alongside her dad has had on her and how the experiences have influenced her own philanthropic choices, while his son recounts him [Mr. Jerabeck] volunteering to coach his little league teams (**Exhibit B-5**).

50.    In his own statement (**Exhibit A**), Mr. Jerabeck's remorse is clear, as is his appreciation for the effect his crime has had on his family and his career. He writes of the rise and fall of 5Linx, and the challenges, both personal and professional, that came

with it (**Exhibit D**). Mr. Jerabeck acknowledges his role in profiting from the relationship he had with a vendor and expresses remorse for his participation in it.

51.     Mr. Jerabeck takes full responsibility for his actions. He, along with his family and friends, acknowledges the debt he must pay to society for his poor choices and requests leniency on his behalf.

## DEFENSE'S REQUEST FOR A FURTHER DOWNWARD REDUCTION BASED UPON DEFENDANT'S COOPERATION EFFORTS UNDER USSG §5K1.1

52.     Mr. Jerabeck was the first of the codefendants to accept a plea offer and was instrumental in the pleas of his codefendants. Both codefendants were aware of Craig Jerabeck's cooperation and plead as a result of knowing that. Mr. Jerabeck encouraged his former partners to work with the government and avoid weeks of trial, and ultimately they both did so. Additionally, he was cooperative throughout the forfeiture and sale of his primary residence. The sale of that property alone accounted for nearly 22% of the total restitution.

## SATISFYING 18 U.S.C. § 3553 FACTORS

53.     Every federal sentencing case involves the application § 3553, and this Court has no doubt seen and recited the relevant sections of the statute hundreds of times. But it is worth emphasizing the fundamental command of the statute: the sentence imposed must be *sufficient, but not greater than necessary* to comply with the purposes set forth in the statute. 18 U.S.C. § 3553(a).

54.     Federal courts in the Second Circuit and S.D.N.Y. have extensive experience with financial crimes and have acknowledged that the loss amounts create fraud guidelines that are too severe:

"By making a Guidelines sentence turn on this single factor, the Sentencing Commission ignored [§3553(a)] and…effectively guaranteed that many such sentences would be irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (emphasis added).

"What drove the Government's calculation in this case, more than any other single factor, was the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006).

55.     This helps to explain why defendants in fraud cases are sentenced well below the Guidelines range, and almost never sentenced above the range, as illustrated in the Sentencing Commission's statistics.

56.     With respect to the sentencing factors and § 3553(a)(2), if the Court is to consider those factors, it is the Defense's position that a period of probation for Mr. Jerabeck would reflect the seriousness of the offense, would promote respect for the law, and provide just punishment for the offense, given the lifelong stigma associated with such a conviction and the losses he has already sustained professionally and financially. See *United States v. Ontiveros, supra*.

57.     The same factors as mentioned above would certainly apply to the purpose of sentencing to "afford adequate deterrence to criminal conduct" is also required to be considered by 18 U.S.C. § 3553, paragraph B.

58.     With regard to paragraph C of § 3553 which states, "to protect the public from further crimes," given the Defendant's lack of criminal history, the effects this has had on himself and his family, the significant level of remorse attached to this conviction, and his change in lifestyle, it appears that he is at an exceptionally low risk to re-offend.

59.     Additionally, Mr. Jerabeck has valid and substantial employment, with the opportunity to grow his business. His sustained employment permits him to make regular payments towards restitution, something that would be diminished by incarceration.

## CONCLUSION

60.     Based upon all the facts of this case, the "parsimony clause", and the unique circumstances as they relate to Mr. Jerabeck, it is respectfully requested that Mr. Jerabeck be sentenced to probation. Such a sentence addresses the seriousness of the offense and remains consistent with recent sentencing in cases of a similar nature with defendants of the same criminal history category.

61.     To date, over $1 million has been paid towards the approximately $2.3 million of restitution. These funds were made available through cash seized in bank accounts and the sales of the Founders' properties, with over $500,000 coming from the sale of the Defendant's property.

62.     Based on all the factors of this case, and in consideration of the §3553(a) factors, specifically, the nature and circumstances of the offense and the history and characteristics of the defendant, his remorsefulness, his meaningful cooperation in this case, his current employment, his desire to continue making restitution, and his continued community involvement, it is respectfully requested that the Court sentence Mr. Jerabeck to a term of probation, a sentence that is sufficient but not greater than necessary.

Dated:     October 15, 2018
           Rochester, NY

                              Respectfully submitted,


                              */s/ James Nobles*
                              JAMES NOBLES, ESQ.
                              Attorney for the Defendant
                              45 Exchange Blvd., Suite 275
                              Rochester, NY 14614
                              (585) 546-1260


TO:    Richard Resnick, Esq.
       *Assistant United States Attorney*

       Kerry J. Chartier,
       *U.S. Probation Dept.*

# EXHIBIT A

October 9, 2018

Honorable Judge Larimer:

I was raised on Long Island in a typical middle class neighborhood, West Hempstead. My step father was a Heating and Air Conditioning installer and repairman. My mom stayed at home to raise my brother, myself, and my stepsister. We lived next door to our cousins and had many friends and family. My grandparents were immigrants from Austria and came to the States in the 1920's as teenagers. They were a significant part of my childhood. We did the typical things kids did back then, went to church, played baseball and stickball, and rode our bikes everywhere. Wednesday and Sunday were pasta nights. It was a fun and simple life.

In 1974, the family decided to move out of the "rat race" of Long Island, to Montour Falls, N.Y., a small town in the Fingers Lakes. This was a difficult move for a 13 year old in eighth grade. It was not an easy time to make new friends, especially when you were a kid from Long Island. I spent my time working when I wasn't in school. My first year there I played JV baseball and worked for a hardware store cleaning and stocking shelves.

I have always been a worker (it was ingrained in me by my grandparents) and soon after found a job at a local grocery and worked there for four years. I ultimately became the store manager at 17 years old. I continued my lawn business, I purchased my first car at sixteen, and saved for college. My step dad was a wonderful man and a great father, but his business never took off so money was always tight. It was clear that I would need to pay for my own schooling.

After high school I attended UB. I had a passion for business and entrepreneurship. I enrolled in the business school, earned my Bachelor of Science in Finance, then my MBA with a concentration in Marketing. I continued to work through college: UB work study programs, fund-raising for the University, the county highway department, selling door to door, property maintenance, and more. In our family, it was always important to be working.

I also did two unpaid internships while at school, one for Fisher Price, the next for AT&T as a telecommunications sales representative. I had found my passion. I loved to sell and I loved technology.

After graduation, I was hired by AT&T and had a very successful eight years there. I was moved several times, and was fortunate to be moved to Rochester where I settled and raised my family. After AT&T, I was hired by Cellular One as a General Manager for Rochester, N.Y. I worked for a terrific company called Associated Communications, who owned the Cellular One Companies in Rochester, Buffalo, and Albany.

Associated sold out in 1994 to another company and it was time to move on and start my own venture. In 1994, I started a chain of wireless retail stores called Cellular Unlimited. I built 23 stores in three years from Buffalo to Boston. I sold the chain to a national retailer in 1997 for $2.6 million. I built many of those stores myself, working throughout the night in the shopping malls.

After Cellular Unlimited, I founded another company called @Wireless. This was also a wireless concept. I chose to franchise the stores and opened 78 locations between 1998 and 2004.

In 2005, I became the full time President and CEO of 5Linx. When I took over the company it had revenue of $3 million and $1 million in losses. Within 12 months, I was able to move the company to $5 million in sales, and profitability. From there, the company grew to $12 million, $24 million, $48 million. In the following years, 5Linx grew to its highest sales and profitability in 2013, with $135 million in sales, $6 million in gross profit, and 235 employees in Rochester, N.Y., as well as thousands of independent representatives.

5Linx's primary product was telecom services. In 2005, we decided to build our own Voice over IP (VOIP) network, which was an internet based telephone service much like the services sold by the cable companies and Vonage. In order to build the network we needed outside funding, which is why we took on the Shalam and Trillium investors. In 2005, we took $3.5 million and gave up approximately 15% ownership of 5Linx. In 2006, we took additional investment from the same parties and gave up approximately an additional 8% of 5Linx, for an approximate total ownership by the investors of 23%.

The terms of the investment were essentially as follows: If the Company performed at or below forecast, the investors would get an 8% annual yield on their money. If the Company performed well (above forecast) the investors would receive a 15% annual yield on their investment. If the Company went public or was sold for four times or more than the share price at the time of the initial investment, then the investors would receive a 400% return, or roughly $22 million.

In 2013, relations between the investors and the founders were getting difficult. There was more and more pressure to buy out the investors, but this pressure was applied by the investors limiting the founders' ability to operate. It was time to negotiate a buy-out. In July of 2013, with the assistance of a telecom-specialized investment banking firm, we presented options to Trillium and Shalam. <u>The option we presented was $16.5 million in cash and retention of 10% of the common shares of the Company</u>. This would have provided the 15% annual yield we had promised in 2005/2006. Plus, they would still own 10% of the Company. This offer was rejected by the investors, who wanted more. They wanted the $22 million they would have received at an IPO price of four times the price at the time of their investment. The decline in landline telephone lines made it clear we would not be selling for four times our initial stock price, or even likely offering an IPO.

We ultimately agreed to buy out the investors, but we did not have $22 million in cash. So, it was decided that we would pay $10.2 million in cash, plus the $1 million dividend already paid, for a total of $11.2 million. The investors' shares would then convert to a promissory note with monthly payments of approximately $250k per month. All totaled, the investors received over $13 million on their $5.5 million investment. I would like to point out that prior to my resignation from the Company, in August of 2015, the investors and all creditors were always paid.

In 2013, the Company acquired a deregulated electricity marketing company to diversify our business away from telecom. We had great success adding electricity customers to our business and the future looked promising. We also planned to launch nutritional products such as protein shakes, healthful coffee, and several other product lines. The launch was planned for the first quarter of 2014. The initial cash need was $3 million in new inventory.

In January of 2014, the Company came upon difficult financial times. We went into 2014 with a significant amount of cash in the bank, over $12 million. Unfortunately, in January of 2014, there was something called a polar vortex in the northeastern United States. Our electricity business suffered $7 million in cash losses in a span of three months. At that time, many deregulated electricity companies went out of business. I was successful in selling our business to one of our suppliers in April for $1 million, which in turn allowed us to retain $3 million in receivables and saved 5Linx from bankruptcy. We still lost $3 million and our electric subsidiary, but the Company could go on.

We also had to spend $3 million on new inventory during the same timeframe that we lost the $7 million due to the polar vortex. The Company's cash had dwindled to less than $1 million. At this point, our lender, Bank of America, called in our six million dollar line of credit based on our first quarter of 2014 financials. We were now forced to sell our telecom business. It took a number of months to sell the business and we were bleeding cash due to the rapid decline in the landline telephone business.

Thankfully, I was successful in selling the telecom business for $7 million in late summer/early fall of 2014. This allowed 5Linx to pay off Bank of America and clean up our balance sheet. However, we were still in a very difficult cash position, and had difficulty making the note payments to the investors. In fact, we were losing money each month. This difficult cash position is what drove the renegotiation of the promissory notes with the investors.

In 2014, the founders dramatically lowered their compensation due to the difficult financial times of the Company. This does not excuse our profiting from the relationship with our supplier, Ocenture. We should not have taken personal compensation from a vendor, it was wrong. This money should have been paid to our independent representatives and the balance to the Company. I do not believe this

would have changed the fortunes of the Company (the losses the Company had in 2014/2015 were too great to overcome), but it was still wrong.

In August of 2015, I formally resigned my position as President and CEO of 5Linx after learning of fraudulent actions of my former partners. In particular, my partners orchestrated a very personal smear campaign against me by making payments to independent representatives who publicly accused me and the Company's HR Director of making improper sexual advances toward one of the Company's independent representatives. During the course of a mediation proceeding with a magistrate judge in the Southern District of New York, my former partner, Jeb Tyler, admitted in front of counsel (Paul Keneally of Underberg and Kessler and Jeff Calabrese from Harter Secrest and Emery) that the "whole scheme was cooked up" to get me to leave the Company.

During the course of the summer of 2015 my former partners were also providing false financial documents to prospective investors. They were using my social security number and personal information, without my consent or knowledge, to attempt to secure loans to the Company. This information was verified and provided to counsel during my defense in a lawsuit brought by my former partners. After the facts were revealed the suit was dismissed with prejudice in my favor by NYS Supreme Court Justice Matthew Rosenbaum.

These two events, the attempt to defame me, and the fabrication of false financial statements were the actions that ultimately led me to resign from the Company. Prior to my resignation the company was paying its bills and the investors.

During the course of 2015 I was able to secure a new investor for 5Linx which would have allowed us to not only keep paying our investors but to also secure new bank financing. This entity called Montbriar was willing to buy 5% of the Company for $1 million. I brought this offer to our investors (Trillium and Shalam), at a board meeting in August of 2015, who agreed that the offer was fair and we should accept it. My former partners, Tyler and Guck, refused the offer and instead attempted to secure loans fraudulently using my personal credit information.

On a personal note, I would like to tell you about my family and a bit about my personal life. I was married to a woman, Mary, that I met in college. We were married in 1986 and together raised three children of whom I am extremely proud. Mary was a stay-at-home mom who helped raise Elizabeth (28), Craig (26), and Katherine (23). All three children were active in sports, church, and community activities, which kept us very busy. I coached soccer and baseball for all three children and attended every sacrament. I am proud to say that after putting them all through college, they are honest, hard working members of their communities. We have had many opportunities to travel and work together forging very strong bonds between dad and kids.

All three of the kids worked hard in high school and college. In addition to other part-time jobs, the kids all worked at 5Linx in entry level positions in the warehouse and

customer service. They proved themselves to be humble, hardworking, and respectful employees, never taking advantage of their dad's position as the CEO.

In addition to raising three tremendous children, which is my proudest achievement, I have done my best to be a contributor in my community. My wife and I were very involved in our church (Transfiguration in Pittsford). We were part of a fundraising team that raised $3 million for the construction of the church, where all three children received all of their sacraments.

I have always strived to be charitable with my time and finances, particularly when it comes to children and veterans affairs. I contributed $25,000 to Strong Childrens Hospital to purchase new incubators. We had a niece who was born at 24 weeks, so this is near to our hearts. During my time as CEO, 5Linx also made donations to the Trayvon Martin Foundation, the Pediatric Cancer Foundation, Urban Youth Impact, Inc., Young Entrepreneurs Academy, and Rochester Ventures Foundation, in addition to numerous local charities across the country.

I took on board positions with the ARC of Monroe County, National Center for Missing and Exploited Children, Catholic Charities, and the NY Says Thank You Foundation which supported survivors and first responders from 9/11, and other natural disasters in our country. My daughter Elizabeth and I traveled with 9/11 survivors and first responders to Grosbeck, Texas to rebuild a veterans home that was destroyed by a tornado. This trip created a memory and special bond for Elizabeth and me that is irreplaceable.

Judge Larimer, I know I made a mistake in judgment. I chose to enrich myself and I misstated my taxes. I fully admit to getting caught up in a scenario that was detrimental to others, and I should have had the sense and the proper moral compass to say no.

I have done my best to make restitution, both renting and later selling my personal home (my primary residence), which generated over $500,000.00 for restitution. I had hoped that would be my retirement savings. My income has been significantly affected by my arrest. I was forced to leave a company I founded in 2016 due to the publicity surrounding the constant press releases and news articles.

I am living a very quiet and simple life in Canandaigua, currently doing several things to support myself. I am working as a general contractor rehabbing houses and doing property management. I work with my significant other at her restaurant doing all sorts of activities from marketing to plumbing, bartending to bookkeeping. This is a new endeavor for her and my business and construction experiences are very useful in starting a new business. Since she owns the building and I have built an apartment upstairs we can live very modestly. I am also hoping to begin a new position (commission only) selling atmospheric water purification systems for a friend's company. I work six days a week, generally 8-5 doing construction and property management, then I work in the restaurant until closing. I am doing my best to

rebuild my life and reputation. I have essentially had my life on hold for three years since my departure from 5Linx due to all of the legal challenges, which I recognize are my own fault.

I am asking you for leniency in my sentencing, so that I can continue working to rebuild my life both professionally and personally and to make restitution. Thank you for taking the time to read this lengthy letter.

Respectfully,


Craig Jerabeck

# EXHIBIT B


**DOYLE**
Security for your life.™

September 14, 2018

Dear Judge Larimer,

I am a local business owner and have served our community for over 35 years. I have known Craig Jerabeck for over 25 of those years. I respectfully ask that the minimum sentence be imposed in Craig's case. I sincerely believe he deserves a second chance so that he will continue to have a positive effect on both his family and the community.

I know Craig to be a devoted, loving and supportive father to his three children. I have seen first hand the strong support he provides for them and the wonderful young adults they have become. I am also aware of his substantial financial and volunteer contributions to many community organizations including Wounded Warrior Project, Strong Children's Hospital, providing a fresh water well to a community in Nigeria, coaching youth sports, Arc of Monroe County and many, many others others.

When I first met Craig I was in charge of finding new members for the Empire State Chapter of the Young President's Organization (YPO). YPO is an organization built on members providing support to one another and we knew Craig was a talented entrepreneur and would be a tremendous addition to our chapter. His support of Empire State YPO and his commitment to supporting and developing young professionals is another great example of his service to the community.

I also had the privilege of introducing Craig at a dinner held by the University of Buffalo Alumni Association in 2015 where he was presented a well deserved Lifetime Achievement Award recognizing him for, in UB's words, "significant, sustained accomplishments that are truly extraordinary, widely recognized as such and of positive and lasting quality." Knowing Craig as well as I do I can say that Craig embodies the definition of this award and I was honored to introduce him.

Craig has done a lot for our community and I believe this experience will inspire him to do even more in the future. Thank you for your consideration.

Sincerely,

Doyle Security Systems, Inc.

John G. Doyle, Jr.
President and CEO

BUFFALO – ERIE – ROCHESTER – SYRACUSE - ALBANY
792 Calkins Road – Rochester, NY 14623
Licensed by N.Y. State Department of State Lic. #12000084040
www.GoDoyle.com

Robin Hoffman
112 Westcombe Park
West Henrietta, NY 14586

September 18, 2018

Hon David G Larimer
United States District Judge
100 State Street
Rochester, NY 14614

Dear Judge Larimer:

I am writing on behalf of Craig Jerabeck.

I began working for Mr. Jerabeck in December of 1997 when he owned Cellular Unlimited. I was contracted through a temporary agency and was hired on full time within 3 months. I was young, newly married and I did not have a college degree, but he took a chance on me, and I was extremely thankful to have a decent paying job with good benefits.

Not long after being hired, he sold Cellular Unlimited but thankfully kept me on as an employee because he simultaneously started a company called @Wireless Enterprises, Inc. Within that year I became pregnant with twins. Long story short, I had a difficult pregnancy and ultimately delivered my babies 3 months premature. Even though I had not worked for Mr. Jerabeck for very long, he was sympathetic to my situation and was very understanding. After I delivered, he told me to go take care of my babies, take as much time as I needed, and my job would be waiting for me when I was ready to return. True to his word, four months later when I called him to tell him my babies finally came home from the hospital he gladly welcomed me back. I spent the next several years advancing through the ranks ultimately becoming his Human Resources Manager at 5LINX Enterprises, Inc. I am confident that I would not have been able to achieve this without a college degree at many other companies. Mr. Jerabeck saw that I worked hard and was willing to learn and that was enough for him. I believe that it was his faith in me that compelled me to succeed.

As a longtime employee, I was able to witness Mr. Jerabeck's compassion and generosity toward other employees as well. We had an employee whose autistic son was hit by a car while riding his bicycle. He knew her financial situation was not great and continued to pay her full salary for several months, so she could tend to her son's life threating situation. One day one of our employees was killed in a motorcycle accident on his way home from work. He left behind a wife and a very young son. Mr. Jerabeck paid for his funeral to help alleviate the hardship on his widow. It was not long after that that he added company paid life insurance as a benefit for every employee to help in future situations like that. These are just a few examples of his kindness, I could go on with many other examples.

It has been several years since I worked for Mr. Jerabeck, and I have landed at a new company as their Human Resources Manager. I will forever be grateful to Mr. Jerabeck for taking a chance on me way back then and for allowing me to not only advance my career in Human Resources but also provide a good life through his generous support of work/life balance for my now 19-year-old children. I know there are several other former employees with stories like mine.

Sincerely,

Robin Hoffman
Robin Hoffman

Michael Weiner                                          10|3|18
Process it Forward-Founder/Owner
16 Oak Hill Terrace
Penfield, New York 14526

Hon. David G. Larimer-United States District Judge- Western District of New York
100 State Street
Rochester, New York 14614

Dear Hon. David G. Larimer:

This letter is on behalf of my friend and business associate Craig Jerabeck. We have known each other and worked together for about 5 years now. We met when Craig was in the early stages of building one of his businesses, coincidentally it was soon after I started my credit card processing company Process it forward (based in my home town of Fairport). Craig was drawn to my organization because of our "Pay it Forward" philosophy that contributes a portion of our net profit to local charities.

I was apprehensive at first of getting involved with Mr. Jerabeck, at the time we met there was a lot of negative information in the press about Mr. Jerabeck and issues with previous business he was involved in. However, I happen to have a couple of friends/ business associates who knew Mr. Jerabeck and had worked with him in the past and had nothing but good things to say about his professionalism and integrity in their interactions with him.

Since honesty and integrity are an extremely crucial aspect of running a successful business in the credit card processing industry, I wanted to make sure that any partnership I created was with businesses and people that have the same moral compass as myself and our organization.

I am truly glad I made that decision to work with Craig. In the 5 years since we have met I have found Craig to be a great asset to me personally and professionally. The assistance/coaching I received from Craig was/is invaluable in the growth and success of my business. I have found Craig to be honest, hardworking and genuinely one of my favorite clients/business partners I have the pleasure to work with.

I also believe Mr. Jerabeck, through his numerous professional contacts and previous philanthropic endeavors could be instrumental in the future growth /expansion of my organization and our positive impact on our community.

If you would like additional information about Craig Jerabeck you can telephone me at 585-309-2234 or my email michael@processitforward.com.

Sincerely,
Michael Weiner

Jeff Parness
275 West 96 Street, Apt. 9F
New York, NY 10025
Cell: 1-917-806-8061
Jeff@NewYorkSaysThankYou.org

May 16, 2018

Re: Craig Jerabeck personal reference

To whom it may concern:

Your Honor, I am writing this letter as a personal reference for Craig Jerabeck and I appreciate your consideration of my reference as part of your sentencing decision making process.

I was introduced to Craig through a personal family friend in the early 2000s and, for a short time, I served as a corporate finance advisor to Craig and his team in the writing of the initial 5Linx business plan for their initial venture capital funding.

Craig also served for two years as a member of the Board of Directors of New York Says Thank You Foundation, a charitable disaster relief non-profit organization I founded 15 years ago and where I serve as Executive Director.

In both his professional capacity and his service to our Foundation, I came to know Craig at a personal level as well.

In September 2007, Craig brought his teenage daughter and a number of colleagues from 5Linx to a small town in east central Texas where our Foundation was helping to rebuild the tornado-destroyed home of the Vincent family, a family that cared for disabled veterans out of their homes for three generations and who also serve as the leadership of the town's volunteer fire department. In 100 degree+ sweltering heat, Craig swung a hammer all weekend long alongside his daughter without pretense or privilege, demonstrating through his humble service and hard work what it means to give back and serve others.

Through his leadership at 5Linx, Craig also found ways to empower their vast membership to be part of the process of giving back to the community. Whether through grassroots sponsorship of our 9/11 Anniversary rebuilding projects which empowered New York City firefighters to help rebuild other communities as part of their healing process, or our historic restoration of The National 9/11 Flag, I personally watched Craig with humility and commitment explain to thousands of members of 5Linx why it is incumbent upon us all to do what we can to help those in need. He did so without seeking publicity or recognition for himself or the company. And I believe he did so with a genuine servant's heart. In Yiddish we refer to this as a true Mensch.

I cannot speak to the crimes which Craig is accused of nor the decisions he may have made by design or default which brought him to this unfortunate predicament.

I know that Craig is a survivor who has been able to re-invent himself after downfalls in his journey through the business world, often I believe, due to his inherent optimism which draws him close to others. What I do believe in my heart is that Craig is the type of individual who has a genuine wellspring

of compassion and commitment to community deep within his character, which if given the opportunity, will enable him to continue to contribute to society for the service of the greater good.

With my sincere appreciation for your consideration of my reference,

Jeff Parness

/s/ *Jeff Parness*

(sent via email/PDF from Israel)

Hon David G Larimer
100 State Street
Rochester, NY

Craig Jerabeck Jr.
70 Park Ave, Apt. 1
Hoboken, NJ

Dear Judge Larimer,

My name is Craig Jerabeck Jr, and I am writing to you on behalf of my father. To give you a brief bio, I grew up in Pittsford and attended Sutherland high school. I then attended Babson College. Upon graduating I began working for Oracle Corporation and still do. I now live in Hoboken, NJ with my high school sweetheart Helen. I enjoyed an upbringing with parents who were always there, always available, and who love me unconditionally. I am truly lucky.

While I doubt I will ever fully understand what has happened over the last few years regarding this case, I do understand my dad. Growing up was full of both work and play. Between my dad coaching little league, watching me play hockey, teaching me how to parallel park, and visiting me at college when I needed a good meal, he was and is everything you could ask for in a father.

I can't forget to mention the work- because if there is one thing he instilled in me, it is that hard work trumps all. My dad is like an ant- he can't stop working. I don't mean in the corporate sense. We always had a beautiful outdoor area because my dad and I would be outside taking care of it. Each year, besides spring cleanup, fall cleanup, painting, shoveling, etc. **we** would edge and spread 29 yards of mulch by hand. If you garden, you know how much that is. Our neighbors thought we were nuts. Would it have been easier to hire out? Sure. But then I never would have learned that you have to get your hands dirty and learn the value of a hard day's work. As I get older, I realize the purpose of those long, dirty jobs and appreciate it more. He didn't have to do it, but he needed to teach me the importance of hard work and spend time with his son. Surprisingly (or maybe not) some of my best memories are from the worst jobs with my dad.

A few years ago when this saga began, our world collapsed. Our name was (and still is) in the paper and news constantly. My parents separated, then divorced. My mom, dad, and sisters have now endured years of stares and whispers, lost friends, and irreparably damaged reputations. We have lost our childhood home. A good, strong family has been decimated. My dad has done his best to shield us from this as a father should, but he can only do so much.

Despite all of this, we are okay. All three kids are well educated, gainfully employed, and forging our own paths. The forward progress has perhaps been stunted, and our hope is that the end is near to truly move forward and on. I attribute our ability to succeed through this to our parents and upbringing. In the future, I hope that we can look back on this as a speedbump and lesson in life and rebuild our family.

I struggle to reconcile my experiences and relationship with my dad versus the legal case against him. My dad is my hero and friend. I know he is a good man who raised 3 amazing kids and truly cares about others and his community.

I was told that you would read this letter and all the others that have been submitted. I deeply appreciate that you are willing to listen. My hope is that you take into consideration these words so that my father and my family can move forward.

Sincerely,

Craig Jerabeck Jr.

Honorable David G. Larimer
United States District Judge
100 State Street
Rochester, NY 14614

Dear Judge Larimer:

I am writing on behalf of Craig Jerabeck as a testament to his good character. Since May of 2016, I have worked side by side with him with in two of his most recent businesses. I was the first person that believed in his vision for his new company and did not hesitate to come work with him. Thanks to him, I have been able to develop a lucrative network marketing business here in Las Vegas, NV where I have lived some 23 years. Craig Jerabeck is a trusted mentor and friend; his great leadership has afforded me wonderful opportunities I would have never gained otherwise.

I have personally witnessed Craig work with impeccable integrity. He has always shown honest and fair conduct in our business dealings. For example….a gentleman he asked to join his company as Vice President of Sales was not someone I felt was a man of integrity. Craig had no idea that this person had proven himself to not be a person who had the same vision as he. He gave him a fair chance, but once he saw that the person was not someone he wanted in his business he did terminate him.

In making my decision to follow Craig's leadership, I was very impressed with the many children's charities Jerabeck supported through his first company. This also impressed my husband, a pastor and minister, and demonstrated for him, Jerabeck's noble and upstanding moral character. It was clear that we had a common passion for community involvement and service. I came onboard with Craig's organization to support his vision to raise funds for nonprofits and religious organizations. Once we started constructing a blueprint for a nonprofit division together, he soon asked me to be the corporate director.

Craig's heart for family and children is a defining trait. He speaks frequently and affectionately about his kids. Whenever they are coming to visit him, he vocalizes a passionate excitement that only a devoted father could express. I know that he and his daughter have served the state of Texas as volunteers and that he has sat on various boards. It is clear his commitment to raising money for children's charities is an extension of his own love and dedication to his family.

I ask you to have mercy on him in your decision, your Honor!


Sincerely,

Mrs. Cornelia M Reeves

October 4, 2018

Hon David G. Larimer
United States District Judge
100 State Street
Rochester, NY 14614

Dear Judge Larimer:

I am writing on behalf of Craig Jerabeck. I first met Craig in February 2013 when I was hired as the Corporate Controller at 5LINX Enterprises. In our time working together, I quickly grew to respect Craig as a businessman, leader and philanthropist.

Craig showed genuine concern about the well-being and happiness of the employees of his Company, whether it be granting an extended leave to an employee whose son suffered a serious brain injury without a second thought or supporting an employee's decision to leave his position with the Company to pursue his dream of becoming a musician. The moment that resonates with me the most was during a very tough time in the Company when the decision was made to sell a division of the Company. After completing a lengthy sales and due-diligence process, the banking group who assisted in facilitating the deal came to Rochester to take the team most involved in the diligence process to dinner to celebrate the closing. While sitting at a table of employees and bankers all celebrating in a victorious mood, the memory I recall most is looking across the table and being in shock at the distant and forlorn look on Craig's face, while the others appeared so jubilant. In the coming days, I felt the urge to stop by Craig's office to ask about this moment, although feeling a bit hesitant to ask an executive about his personal feelings. I stopped by his office asking if he had a moment to chat and he warmly invited me in, at which point I asked him if "everything was ok", specifically citing that moment. As the CEO of large Company, his answer would have been surprising, but having grown to know Craig, I was more in awe than shocked. Craig stated as to how upset he was about the transaction, not because of the terms of the deal, but rather that so many of his employees would need to be let go. This is the kind of leader Craig is. While everyone at that table was eating, drinking and laughing, Craig was worried about the well-being and future of each and every employee who was affected by this transaction.

In addition to this compassion displayed for his employees, Craig showed equal concern and generosity for the community. At every large gathering of Company representatives, Craig and his partners would select 1 charity from the community to be recipient of a donation. At the event, representatives of the company would donate funds, and 5LINX would match this donation. From a business standpoint, as finances grew tighter, it was suggested that we Company stop this charitable donation. The case was made that putting a hold on this giving would not affect business or representative enrollment, an argument that was most likely true. While it was widely accepted that this would save the Company a significant amount during

any given year, Craig would not put a stop to this donation, realizing how much these donations were impacting the charities on the receiving end.

In the 5 years I have known Craig, I have remained impressed by his compassion and desire to create jobs and opportunities not only in Rochester, but across this country. Craig has given tens of thousands of people not only a steady income, but hope that they can create a better future for themselves and their families, and this is the man and spirit I continue to respect.

Sincerely,

Andrew Behe
479 Aria Lane
Webster, NY 14580
585-764-8981

October 5, 2018

Hon David G. Larimer                              Vinson Montgomery
United States District Judge                       2904 Yarmouth Ln
100 State Street                                   Mount Laurel, NJ 08054
Rochester, NY 14614

Dear Judge Larimer:

I am writing on behalf of Craig Jerabeck. I have known Craig Jerabeck over 9.5 years. I want to give you a little background about me. I have worked as a high- level Criminal Investigator and top performing Polygraph Examiner for 33 years. I have been trained by the top professionals in the CIA, FBI, DEA and other Law Enforcement Agencies. I was a top Supervisor and leading Polygraph examiner managing a polyraph unit which covered the entire State of New Jersey and dealing with every type of indictable offense on all levels (including organized crime). I am now retired. Your Honor I share this because I have the training and experience to really "know and learn" things about people.

I have had the opportunity to work with Craig Jerabeck and become friends with him as we worked on several business projects together and traveled domestically and internationally. I can honestly say that I never met a finer person who is honest and has the intersest of all of those around him as his number one priority. I have witnessed him help thousands of people improve their lives. Over the years I have witnessed him give to various organizations and charities. I was actively and personally engaged with Craig Jerabeck with three companies dating back to 2009. The three companies were 5Linx, Paycations, and AGS. During each business project lead by Craig Jerabeck I have personally witnessed him pouring into the lives many individuals from every racial and ethinic background imaginable. I have personally witnessed him and the companies he led, donate to multiple nobal organiztions, such as:

- Digging a fresh water well for a community in Nigeria with no potable water.
- Over $25,000 in donations to Strong Children's Hospital in Rochester NY.
- Wounded Warrior project, whereby we raised $30,000 for the building of veteran rehabilitation home in Montana.
- NY Says Thank You Foundation, of which I was a Board Member and our Company raised over $50,000 to restore the Flag that now hangs in the National 9/11 Museum in NYC.

It has been a tremendous blessing for my wife and I to work in three successful businesses led by Craig Jarabeck. He has employed thousands of people and helped tens of thousands start small businesses across the country and around the globe. I have been most impressed with how he operated with integrity.

Sincerely,

Vinson Montgomery

Vinson Montgomery

September 16, 2018

Hon David G. Larimer
United States District Judge
100 State Street
Rochester, NY 14614

Dear Judge Larimer:

I am writing on behalf of Craig Jerabeck who I have known for about 30 years. I have worked both with him, at Genesee Telephone Company in the late 80's, the first independent cellular company in Rochester as well as for him, as CFO, in a cellular agent company he started called Cellular Unlimited in the 90's. We both branched off from there and I started my own CPA business and eventually met back up with Craig in 2010 and preceded to do some tax work for a couple of his business ventures. I've been around Craig and his family when his kids were young where Craig was involved heavily in their lives juggling business trips and coaching youth sports (baseball, softball, and soccer) for all 3 children as well as making sure each of them was also involved in community events. Craig wanted them to be well rounded as they grew up and he did a great job parenting three wonderful children who now have grown into successful adults. It was easy to see he was a loving and caring father.

When I worked with him I didn't come to know Craig as well as I did when I worked for him. His ventures such as Cellular Unlimited were small companies where everyone was hands on. He employed initially tens of people and grew his businesses into employing hundreds. He was very fair with his employees and didn't expect them to do anything he wouldn't do himself. He was respected by his employees as a fair leader with exemplary character. In addition, he had a huge heart for charities, especially children's health organizations such as Golisano Children's Hospital and veteran's organizations such as Wounded Warrior Project and provided significant financial contributions both personally and through his businesses. He also provided leadership assistance as a board member to multiple local organizations. He would help anyone individually or through his businesses if he could. That's who he is.

Sincerely,

John J. Marchaesi

Hon David G. Larimer
United States District Judge
100 State Street
Rochester, NY 14614

Dear Judge Larimer:

I am writing on behalf of Craig Jerabeck.

My Name Is Jamie Trovato, I met Craig Jerabeck when I was 28 years old in 2001. We were introduced via mutual friend. At the time Craig had considerable business success and was about to achieve even greater things personally & professionally. Through the years Craig has remained one of my closest friends and business mentors. He has helped me in so many ways to become the person & professional I am today.

Craig was and has always been extremely humble and generous in so many ways. Whenever I have needed help from Craig he has always been there to help. In 2008 my cousin was severely injured in a horrific incident that left him paralyzed as 22 year old. When I reached out to the community to help raise awareness Craig was the first one there with a generous monetary donation.

I have seen Craig give back in so many ways. His Charitable contributions are well documented. He was always there for his children no matter how busy he was professionally. I witnessed this first hand when I used to umpire girls softball. I literally used to see him at the games he was there for his children. This gave me higher level of respect for him and it taught me as a young father this is what and how a true professional acts. I never miss my children's events. Craig is one of the reasons why.

I know his children very well especially his son Craig Jr. if you ever want to see what kind of parent someone is look at their children. Craig has the nicest most respectful children I have ever met. They are all extremely successful adults now.

Over the years some of the things that have always impressed me the most is how Craig interacts with different individuals. One of the things I have noticed is he treats everyone with the same level of respect whether it be a business leader or just a random person on the street. He always puts other people needs and interest first. Craig was always kind and gracious to all the people that worked within his many companies.

I would ask that you that you please consider these facts about Craig's character when you make your decision.

Sincerely,



September 14, 2018

Dear Judge Larimer:

I am writing on behalf of Craig Jerabeck as a character reference in this pending sentencing hearing this coming month. I have known Craig as a friend for over 15 years as a close associate in an organization called the Young Presidents Organization, which acts as a peer group for younger executives. While Craig and I are no longer "Young" Presidents, we have shared many close and personal conversations over many years as we served as confidential peer consultants to one another through the organization. The Organization encourages such relationships to help executives navigate the challenges of running significant business organizations.

Through that experience, a friendship is bound to develop for people who share the challenges of running a business on both their professional and personal lives. That certainly became the case with Craig, as we spent hours and hours together including attending numerous retreats in off-site locations. You get the opportunity to get a real perspective on a person through this experience. In Craig's case, over the many years together, I had an opportunity to get a very good view of him as a father, community leader, and cheerleader to thousands of employees whose lives were improved by the fact that Craig had the courage to build a major business from scratch. He lived up to the task in an exemplary manner.

Building a business from scratch is no easy feat. It is a 24/7 endeavor which took him all over the world inspiring and leading thousands of employees of his direct marketing company 5Linx. As he did that, he also juggled raising a family and playing an active role in the Rochester community. As part of the YPO conversations, I heard how much he put into his children's lives including building their character through important father son or daughter activities. One story I remember well was taking his teenage daughter to Texas to rebuild a veteran's home destroyed by a tornado with a group of 9/11 responders and survivors. He was focused on making not only a better life for his children, but also gave of himself to the community through board leadership at Arc of Monroe Country and other community boards. Being a CEO of a large company with children, I know just how challenging it is to juggle all of these responsibilities with the pressure involved of trying to make sure that you cover all the bases. In my personal experience, that is what Craig did over and over through the decade and one half that I have known him.

If I could leave you with a final thought, it is that Craig is a person who has made a difference in thousands of people's lives by making their lives better. Whether it was business associates, family members, friends or community members, Craig Jerabeck has a long and demonstrated track record for making people happier and more successful. This is no easy job. He often did this at great personal sacrifice and I ask you to consider my comments as you review the case. Thank you for your consideration.

Sincerely,

Kraig Kayser
President and CEO
Seneca Foods Corporation
3736 South Main Street
Marion, NY 14505

585-230--0312



October 12, 2018

Hon. David G. Larimer
United States District Judge
United States District Court for the Western District of New York
100 State Street
Rochester, New York 14614

**Re: Craig J. Jerabeck**

Dear Judge Larimer:

Please accept this as a letter of strong support and attestation of character for Craig Jerabeck in connection with the proceeding currently pending before you.

I have known Craig for almost 20 years, first as a valued business client and then as a cherished friend.

I was initially introduced to Craig in 2000 by other clients and have had the opportunity to get to know him well over many years of assisting him with numerous business and personal legal matters. He is a consummate business professional and executive who extends fair and compassionate consideration for each person he encounters in his path of life.

We have grown especially close recently due to the challenges he currently is facing, and I welcome the opportunity to better acquaint you with the person and man that Craig is.

First and foremost, Craig has accepted full personal responsibility for the issues currently before you, despite the involvement and roles of others in the matter. He regrets that had he been a stronger executive and person and made some management and leadership decisions differently, the history of 5Linx Enterprises, Inc., and the experience of its investors, would not have been tarnished by the challenges at hand.

He is mindful that his reputation and character are forever blemished, despite his tremendous business accomplishments, his generous charitable contributions of time and money to so many communities and organizations, and his life as a devoted father and family person.



**CONTACT**
SteinbrennerLaw.com
Phone | 585 730 7357
Fax | 585 486 6555

**LOCATIONS**
104 Troup Street
Rochester, NY 14608

297 Parkside Dr. #407
Canandaigua, NY 14424

Craig's business skills have benefited and improved the lives of thousands. Through hundreds of quality jobs directly created by three different successful companies as well as the indirect economic benefits to the numerous suppliers and customers of his businesses, Craig's entrepreneurship has positively impacted countless individuals across the country and around the world.

Additionally, he has given so much over the years to the communities his businesses served or were involved with. A key belief and value of Craig is that businesses have the responsibility and obligation to give back to the community. Craig personally has always been committed to volunteering his time and skills for service on non-profit and charitable boards. ARC of Monroe County and the National Center for Missing and Exploited Children are two that come to mind. Evidence of his commitment to others is also evident from the sizable business and personal donations he has coordinated or made over the years. He has even personally volunteered for hands-on charitable work to help those in need when time permitted.

His love for his family goes beyond saying. He frequently spends much time with his mother which brings incredible joy to her. He often gets together with his son and two daughters, who all have grown into incredible young adults as a result of Craig's fatherly guidance and loving care.

In short, I cannot say enough about Craig as a wonderful father, friend, and person. He is generous, kind, and a considerate human being for which the present situation is so out of character and totally inconsistent with. The Craig Jerabeck that I know and have experienced is someone who, upon learning that I was trying to line up attorney office space on short notice, immediately contacted me and graciously offered me an extra office he had available at his business premises until I could procure something better. Others I know have similar stories of Craig reaching out and assisting them with something simply because it is part of his inherent nature to want to help others.

While others may question his basic integrity, honesty, and trustworthiness, I do not. I have seen these qualities become even stronger in the face of the recent challenges. The measure of a person is how they face adversity, and by that criteria, I believe Craig should be and can be easily recognized for the quality person he is.

He is moving forward with his life, actively working with his son in the renovation and improvement of substandard real estate properties in the Greater Rochester area, again bettering the lives of many. Society will only benefit from Craig being able to continue his personal life as quickly as possible.

My high opinion of Craig has not been diminished by the recent circumstances and I wholeheartedly support Craig being given the greatest of consideration and leniency in this matter.

Very truly yours,

Carl A. Steinbrenner, Esq.

October 4, 2018

Dear Judge Larimer,

My name is Elizabeth Watson. I am Craig Jerabeck's oldest daughter, and am writing to you in anticipation of my father's upcoming sentencing hearing. I am 28 years old, and I live in Syracuse with my husband and our dog. I am an HR Consultant, and my husband is a Financial Planner.

I find myself rather stymied by the idea of conveying my entire life experience with my father to you in an adequate way. However, I will do my best to communicate the man I know and have grown up with and the values that he has instilled in my siblings and me. My hope is that you will take away a more fully formed idea of the person my father is and the values that he has instilled in his family, and will be able to use that insight to inform your decision.

Throughout the entirety of this seemingly never ending epic, there has been a focus placed on monetary value; the value of a property, the amounts owed and paid to investors, the total of taxes paid or owed. Contrarily, the memories that I gravitate towards most are not those involving money, but are the memories involving time together. Beginning when I was a little girl, my siblings and I would each have "special time" with our dad. My favorite "special time" activity was going to get a coffee -mine was mostly hot chocolate with a splash of coffee and lots of whipped cream. As I got older, I joined the crew team. My dad would come to all of our regattas and ride his bike along the entire route to watch.

With all of that being said, one of my favorite memories is going on college visits with my father. He and I sat around a map and drew a 6-hour radius from Rochester. We went through the list of potential schools together, and then went on a corresponding road trip to check them all out. It was enlightening to hear about my dad's college experience, and what he hoped to come from mine. I ended up completing my undergraduate degree at Geneseo, right down the road from Rochester, and then went on to get my MBA at RIT. It turned out that my dad and I didn't need to traverse the East Coast in search of a college, but I am immensely glad that we did.

We also spent time as a family giving back to the community. My dad and I went to Texas one year with a group of first responders from Ground Zero on 9/11. We spent several days in September rebuilding a home for veterans that had been destroyed in a natural disaster as a constructive activity on the anniversary of 9/11. My mother has always been actively involved in the community, and each year, our family would adopt a family for Christmas to ensure that they had food, warm clothes and gifts for the holiday season. As an adult, I am a member of the Advisory Council Board for the Early Head Start of Syracuse. Each of these philanthropic experiences, and countless others, contradict the picture that has been painted throughout this case. It is difficult to align the life experiences and values that have been instilled in my family with the case over which you are presiding.

It is my sincere hope that this information demonstrates to you the person that I know my father to be; a person that is focused on the well-being and happiness of his family, as well as strangers. Thank you for your time and consideration.

Sincerely,
Elizabeth Watson

Hon. David G. Larimer
100 State Street
Rochester NY

Katherine Jerabeck
127 West Church St.
Fairport NY

Dear Judge Larimer,

My name is Katherine Jerabeck and I am writing this letter to you on behalf of my father, Craig Jerabeck. I am the youngest of Craig's three children. I graduated this past year with my Master's degree in Reading and Literacy and am embarking on my career this year teaching high school English in my alma mater.

To write a single paged letter describing the character of my father for his sentencing is incredibly painful and a daunting task. What do I share? The countless hours we spent swimming together during the summer? Playing on the swing set in our backyard that he and my grandfather built themselves? The times I would nudge him when he fell asleep reading *The Bernstein Bears* books to me before bed, and then he would read 3 more? Those are all examples of time spent with my father, but I am going to share with you my favorite Dad and Kate thing: eating grilled cheese.

Growing up, I was a competitive dancer. I trained in ballet, pointe, tap and jazz nearly every day after school for multiple hours. I loved it, and my parents nurtured that love. Every night after dance, the rest of my family would be getting ready for bed, and Dad and I would eat grilled cheese for a second dinner together. We would try out new breads; debate mayonnaise vs. butter; dip it in different sauces; and pick our favorite sides (a pickle), all while talking about our days. Some days they turned out amazing, some days we burnt them; regardless, Dad and I sat at the kitchen counter and ate together.

I am a teacher now, and my students share with me their experiences—their family woes and triumphs, goals and setbacks. It often strikes me, as I walk the halls of my old high school wearing my "Teacher" badge, how incredibly lucky I am to have parents like mine. I became a teacher because of all that they taught me. We read together constantly, and through literature my parents fostered in me a love of learning..

The past few years have been difficult. Our family is strong; we have always been a team. But this has been a marathon for which none of us signed up. The most difficult aspect of this experience has been the discrepancy between my knowledge of my father, and the current case. My father once actually fell into the Erie Canal trying to retrieve a napkin that had fallen in because he had always taught us not to litter. This case and the media surrounding my father is not the Craig Jerabeck that I have known for the past twenty-three years of my life. I hope that these letters offer a glimpse into Craig Jerabeck from those who know him.

I appreciate the opportunity to share this information with you, and I sincerely appreciate your time.

Sincerely,

*KJerabeck*

Katherine Jerabeck

Scanned with CamScanner

# EXHIBIT C

Craig Jerabeck has over 30 years of business-building experience both domestically and internationally, doing business in numerous countries in Europe and Asia.

For the past 22 years he has been involved in entrepreneurial ventures, founding four successful companies.

His latest venture, Ascend Global Services (successor to 5.0 Energy LLC), is a provider of essential services for home and office. The Company represents brands such as ADT, DISH, Direct Energy, Solar Energy, and many more.

He was a founder and President/CEO of 5LINX® Enterprises Inc. since 2001. He was formerly the President/CEO and founder of @Wireless Enterprises, a franchiser of wireless retail stores. @Wireless operated 78+ stores in 11 states. He founded Cellular Unlimited Corp., which operated 23 shopping mall based retail stores in NY, MA, RI, NJ, DE, and FL.

Jerabeck spent two years as the General Manager of Cellular One (later AT&T) in Rochester, NY, and eight years with AT&T in sales and sales management. He has an MBA and a B.S. Finance from the State University of New York at Buffalo.

Craig Jerabeck is an Ernst and Young Entrepreneur of the Year winner and Retailer of the Year Winner. He served on the Wireless Advisory Board for the Consumer Electronics Association. He has served on several not-for-profit boards, including the ARC of Monroe County, New York Says Thank you, and Catholic Charities. Additionally, Mr. Jerabeck served on the Advisory Board of the National Center for Missing and Exploited Children.

Craig Jerabeck's companies have been on the Inc 500/5000 list nine consecutive times and on the Rochester Top 100 Companies nine times. Jerabeck was recently honored by the University of Buffalo with a Lifetime Achievement Award, "the award recognizes significant sustained accomplishments that are truly extraordinary, widely recognized and as such of positive and lasting quality."

Jerabeck has also been a supporter of numerous charitable organizations supporting children's advocacy and wounded veterans.

# EXHIBIT D

*25th Anniversary*

# SPECIAL ISSUE

# Inc.

**The Handbook of the American Entrepreneur**



# 500

# AMERICA'S
# FASTEST
# GROWING
# PRIVATE
# COMPANIES

Congratulations to
LINX Enterprises
No. 338



**Company Profile** 5LINX Enterprises, Inc., headquartered in Rochester, New York, was founded by three visionaries, Jeb Tyler, Craig Jerabeck, and Jason Guck. With over 40 years of combined experience in the telecommunications and direct sales industries, they built 5LINX based on the principles of: Vision, Integrity, Opportunity, Freedom, and Success. *Their mission: to create a company where the representatives come first.*

Committed to staying at the forefront of marketing the latest in cutting edge technology, 5LINX has partnered with some of the largest companies within the telecommunications industry to offer the most extensive range of products and services. This enables the thousands of 5LINX representatives across the country to have a unique competitive advantage.

Recently, 5LINX launched its own platform, GLOBALINX, for Voice over Internet Protocol, or VoIP, digital phone service. Through this service, and the exclusive GLOBALINX VideoPhone, 5LINX is changing the way the world communicates!

## 5LINX Enterprises  NO. 338
### 400.8% Three-Year Growth
FOUNDED: **2001**   **Rochester, N.Y.**

5LINX sells through a direct sales force the GLOBALINX VideoPhone, VoIP and wireless services, and many other products and services making it a one stop shop for telecommunications needs. CEO Craig Jerabeck says strong consumer interest in VoIP helps 5LINX recruit representatives and sustain fast revenue growth.



**5LINX**™

1500 Methodist Hill Drive, Suite 1500
Rochester, NY 14623
585-359-2922
Fax: 585-359-0233
*www.5LINX.com*

---

## Inc.500

**About the Inc. 500** This year, *Inc.* magazine celebrates the 25th anniversary of its annual ranking of the fastest-growing privately held companies in the United States. These companies are where the action is—they're leaders with cutting-edge business models whose rapid growth shows that they've figured out how to meet the most pressing needs of today's economy. Data from investment research firm Morningstar shows that only 33 publicly traded U.S. companies show three-year revenue growth higher than the No. 500 company on this year's list. The Inc. 500's illustrious alumni roster includes such household names as Microsoft, Oracle, E-Trade, Domino's Pizza, Jiffy Lube, and Super 8 Motels.

Copyright 2006 Mansueto Ventures LLC, publisher of *Inc.* magazine. Reprinted with permission.

# Top 100 gather to honor business acumen

**■ Iannone says way out of slump is with small, medium firms.**

JIM STINSON
STAFF WRITER

The way out of the recession and into a sustained recovery is through small- and medium-sized businesses, ones that didn't rely on a federal bailout.

That was the assessment given Thursday by John Iannone, founder and CEO of Auction Direct USA, the No. 1 company in the 2009 Rochester Top 100, as he spoke at the 23rd annual luncheon honoring the region's fastest-growing private businesses.

The event drew 1,800 people to the Riverside Convention Center.

Economists have said the vast majority of new jobs after the 1990-91 and 2001 recessions were created by small businesses, though there is concern that such businesses might lack the financial strength to repeat their past hiring successes.

Iannone acknowledged that during the depths of the recession, lending from banks tightened considerably. The Federal Reserve said this week that credit remains tight.

But the positive statements echoing through the convention center indicated that Top 100 businesses are upbeat about their prospects coming out of the economic downturn.

Executives of the No. 2 company, the telecommunications firm 5Linx Enterprises Inc., said their goal is to build revenue from an anticipated $52 million this year to $1 billion in five years. CEO Craig J. Jerabeck said the company is having a good year despite the recession. 5Linx recently bought a portion of a smaller telecom, Kancharla Corp. of Huntsville, N.C., for $3 million.



CARLOS ORTIZ staff photographer
John Iannone, CEO of Auction Direct USA, ranked No. 1 company in Rochester, speaks at the Rochester TOP 100 luncheon Thursday.

And No. 3 Optimation Technology Inc. said it has positioned itself for further growth when its business clients begin to spend more freely.

Iannone's Auction Direct burst into the Top 100 this year, winning the No. 1 ranking in its first year in the program, which is sponsored by the Rochester Business Alliance and the accounting firm KPMG. He said before the luncheon that the 200-employee company took a different approach to used car sales and capitalized on the Internet to gain a national reach.

The Victor-based company has four locations: two in the Rochester area and in Jacksonville, Fla., and Raleigh, N.C. □

JFSTINSO@DemocratandChronicle.com

CARLOS ORTIZ
staff photographer
**Craig Jerabeck, CEO of 5Linx Enterprises, with the second-place award.**

CARLOS ORTIZ
staff photographer
**William Pollock, CEO of Optimation Technology, accepts the third-place award.**

---

## Top 100 gather to honor business acumen

will be pre-
luncheon from
:15 p.m. Nov.
ont Country
Ridge Road.
: $20 and
are required.
or details,
-7272.

**arner's
own 11%**

**ner Cable** profit fell 11 ie third quarter down by est expenses mpany piled eparate from arent, **Time**

ner Cable million, or 76 are, in the ns that ended npared with ., or 92 cents, er. rose 3.7 per-billion.

**arnings**

**a Foods Corp.** ncreased 2.5 $323.2 million l quarter that . 26. me County-ufacturer of its and vegeta-ding the Libby's ) said profit $12.4 million, r share, from n, or 36 cents. **Properties,** ster-based l operator of complexes, quarter funds ations amount-nillion, or 81 are, down from ion, or 84 cents, lier. er, the results lalysts' expecta-

mpany, with in the Northeast, itic and south-da markets, also guidance on m operations for ear to a range of .24 per share d with the previ-to $3.22. □

ff and wire reports

**sees
upsi
repo
reve
decl**

STAFF REPORTS

Declari mentum is up," PAE Corp. CEO nis told W lysts Thu company significan the third q

His stat PAETEC execu-tives dis-cussed fi-nancial results for the quar-ter that ended Sept. 30 The tele-commun pany saw in revenu the third but urge at growth basis, n rose fro quarter.

The company of $395. July-Sep compare lion in quarter a in the se

PAET in the m of $6.5 m with a $ year ear charges

Chesc secured new cus a nation ness ch and a m firm wit

PAET debt by the qu pany's : cent Th

# Rochester's Top 100 businesses honored



CARLOS ORTIZ staff photographer

**From left: Optimation CEO William Pollock; 5LINX Vice President of Sales Jason Guck, Executive Vice President Jeb Tyler and CEO Craig Jerabeck; and Turner Bellows CEO Amanda Pontarella and Vice President Joseph Merry at the Rochester Business Alliance Top 100 awards luncheon Wednesday.**

## Crowd cheers, celebrates roll call of winners

**SEAN DOBBIN**
STAFF WRITER

When their company's name appeared on the screen, employees from IBC Engineering PC hooted and hollered and gave themselves a standing ovation. Not to be outdone, SPS Medical Supply Corp.'s table rang bells and pumped their fists as they whooped about their company's ranking.

And when the logo of Turner Bellows Inc. finally appeared, employees of Rochester's fastest-growing privately held company threw their napkins in the air in celebration.

Always a spirited event, the Rochester Business Alliance's Top 100 luncheon drew a crowd of 2,000 area businesspeople to the Riverside Convention Center on Wednesday afternoon. When the list was announced in reverse order, applause, whistles and shouts filled the ballroom, as each company celebrated its recent success.

For No. 1 company, Turner Bellows, a Rochester-based contract manufacturer, the top spot on the list represents a peak in what has been a rollercoaster ride for the 73-year old company. After a freak accident took the life of then company owner Richard Pontarella in 1998, Turner Bellows struggled to find its way in an increasingly difficult manufacturing climate.

But thanks to a willingness to take on a wide variety of manufacturing jobs, the company rebounded and is now on a upswing. Twenty-eight year old Chief Executive Amanda

### Online Extra

**DEMOCRATANDCHRONICLE.COM**
▶ Click on this story to search a database of the Top 100 companies.

Pontarella, Richard's daughter, accepted her award along with Vice President Joseph Merry, and said that she wanted to talk about her father, but thought it was best left to her colleague.

"Joe had to do the part of the speech about my father because I didn't want to tear up in front of 2,000 people," she said afterward.

Optimation Technology Inc., a Rush-based engineering and fabrication firm, and 5Linx Enterprises, a Henrietta provider of voiceover Internet





**TOP 100,** PAGE **7D**

A CELEBRATION OF ACHIEVEMENT:

THE INAUGURAL
UNIVERSITY AT BUFFALO
ROCHESTER ALUMNI DINNER

# 2015

THURSDAY, JUNE 4, 2015
CASA LARGA VINEYARDS WINERY ❧ FAIRPORT, NY



COCKTAIL HOUR

DINNER

WELCOME
Matthew R. Prok, BS '11, BA '11
*Rochester Chapter President*

REMARKS
Lawrence J. Zielinski, MBA '77, BA '75
*Executive Director, Office of Alumni Engagement*

AWARD PRESENTATIONS
**Young Alumni Award**
Presented by Christopher J. Daly, PharmD '12, MBA '12

**Distinguished Alumni Award**
Presented by Cynthia M. Shore, MBA '83, BS '81

**Lifetime Achievement Award**
Presented by John G. Doyle Jr.

REMARKS
Mary Garlick Roll, MS '88, BS '84
*President, UB Alumni Association*

CLOSING REMARKS
Matthew R. Prok

# LIFETIME ACHIEVEMENT AWARD



CRAIG J. JERABECK, MBA '84, BS '83
ROCHESTER, NY

Craig Jerabeck is founder, president and CEO of 5LINX®
Enterprises, Inc., a direct marketer of telecommunications
products whose services include VoIP, wireless, satellite and
local telephone services. As president, Jerabeck has implemented
new business strategies, technologies, processes and disciplines,
leading to significantly reduced operating costs and enhanced
productivity. In 2012 the company was ranked No. 1 in the
Rochester Business Alliance's "Rochester Top 100." Prior to his
role at 5LINX, Jerabeck was founder, president and CEO of @
Wireless Enterprises, a franchisor of wireless retail stores.

Jerabeck has participated in multiple boards including Arc of
Monroe County and the Genesee Valley Trust. He was named
Entrepreneur of the Year in 2003 by Ernst and Young, Retailer of
the Year in 2004 by Entrepreneur Magazine, and most recently
ranked #2 in the Rochester Top 100 (2009).

Jerabeck holds a Bachelor of Science degree and a Master
of Business Administration degree, and is a generous UB
supporter, both as a donor and a volunteer.

The Lifetime Achievement Award

*The Lifetime Achievement Award is presented to University at Buffalo alumni living in the Rochester
area, for their significant, sustained accomplishments that are truly extraordinary, widely recognized
as such, and of positive and lasting quality. The awardee will be honored for creating a legacy that will
be remembered for years to come.*

# The telecom magnate

JANUARY 2016

**Craig Jerabeck, BS '83, MBA '84,** is co-founder, president and CEO of 5LINX Enterprises, a direct marketer of telecommunications products, energy services, security systems, wellness products and more for consumers and businesses.

The Rochester-based company has made the Inc. 5000 list of the fastest-growing companies consecutively for the past nine years and has rocketed from a bootstrapped startup to a global operation with $135 million in annual sales.



## Hard lessons

Back in 1994, Jerabeck founded his first business, Cellular Unlimited, a cellphone retailer that would grow to 23 stores before he sold it in 1997. Success didn't come easy. To raise startup capital, Jerabeck mortgaged his house—but his partner bailed.

"I ran out of money two weeks before Christmas and had nothing, no inventory on my shelves and no cash," he says. "That was the first major hurdle—learning that everything that can go wrong would."

## A new model

Next, Jerabeck founded @Wireless, a cellphone franchiser that operated 78 stores in 11 states. During this period from 1997 to 2004, 5LINX was born. Constantly searching for new distribution channels, Jerabeck and co-founders Jeb Tyler, BS '96, and Jason Guck decided to start their own.

"The challenge was learning a different business model," says Jerabeck, who was named Entrepreneur of the Year by Ernst & Young in 2003. "This is about trying to get people passionate about joining your business. Getting recruitment to be predictable, stable and measurable was the biggest challenge because it was foreign to me."



*In June, Jerabeck received the Lifetime Achievement Award from the UB Alumni Association's Rochester chapter. From left: Christopher Diehl, PharmD/MBA '12, who accepted the Young Alumni Award; Jerabeck; and J. Michael Colyer, MBA '96, who received the Distinguished Alumni Award.*

## Company culture

With 235 employees and 95,000 sales reps in eight countries, Jerabeck says a strong company identity is vital to 5LINX's success. "It's building a sense of family and making people feel like they belong," he says. "We always talk about, 'What's your why?' We want to understand what's driving you to take on a part-time sales business."

The perks aren't bad, either. Top performers earn vacations, Bentleys and other incentives. "One of our most successful people used to drive a bus. Now, he wears $2,500 suits and has written a book," Jerabeck says. "He's an ordinary person, and other people see that. That can be enormously powerful."

*Written by Matthew Biddle, this story originally appeared as part of the cover feature in the autumn 2015 issue of Buffalo Business.*

All Stories | Previous Story | Next Story

# Buffalo Business

The magazine for alumni and friends
of the UB School of Management

Autumn 2015

# Startling Upstarts

How **15-year-old Zandra Cunningham**
and eight other entrepreneurs turned
innovative ideas into thriving businesses

**UB** School of Management
**University at Buffalo** *The State University of New York*

# The **Telecom** Magnate

CRAIG JERABECK

Craig Jerabeck '83, MBA '84, is co-founder, president and CEO of 5LINX Enterprises, a direct marketer of telecommunications products, energy services, security systems, wellness products and more for consumers and businesses. The Rochester-based company has made the Inc. 5000 list of the fastest-growing companies consecutively for the past nine years and has rocketed from a bootstrapped startup to a global operation with $135 million in annual sales.

## Hard lessons

Back in 1994, Jerabeck founded his first business, Cellular Unlimited, a cellphone retailer that would grow to 23 stores before he sold it in 1997. Success didn't come easy. To raise startup capital, Jerabeck mortgaged his house—but his partner bailed. "I ran out of money two weeks before Christmas and had nothing, no inventory on my shelves and no cash," he says. "That was the first major hurdle—learning that everything that can go wrong would."

## A new model

Next, Jerabeck founded @Wireless, a cellphone franchiser that operated 78 stores in 11 states. During this period from 1997 to 2004, 5LINX was born. Constantly searching for new distribution channels, Jerabeck and co-founders Jeb Tyler '96 and Jason Guck decided to start their own.

"The challenge was learning a different business model," says Jerabeck, who was named Entrepreneur of the Year by Ernst & Young in 2003. "This is about trying to get people passionate about joining your business. Getting recruitment to be predictable, stable and measurable was the biggest challenge because it was foreign to me."

## Company culture

With 235 employees and 95,000 sales reps in eight countries, Jerabeck says a strong company identity is vital to 5LINX's success. "It's building a sense of family and making people feel like they belong," he says. "We always talk about, 'What's your why?' We want to understand what's driving you to take on a part-time sales business."

The perks aren't bad, either. Top performers earn vacations, Bentleys and other incentives. "One of our most successful people used to drive a bus. Now, he wears $2,500 suits and has written a book," Jerabeck says. "He's an ordinary person, and other people see that. That can be enormously powerful."



Photo: Rich Fiallo

TIM GODZICH

### His lifelong motto

With this venture, Godzich hopes to translate his personal motto, "Make it a great day," into a brand that encourages customers to enjoy each moment. So far, his bags—the first of several products in the pipeline—are available online and at Denver-area shops.

He remains involved in the health care industry as an investor in several health-related startups and an advisor for the University of Colorado's Anschutz Health and Wellness Center. In addition, Godzich meets frequently with other entrepreneurs, offering his perspective on ideas and strategies.

"As an entrepreneur, you should talk to as many people as possible to absorb their knowledge, learn an industry and get feedback on your idea," he says. "Plenty of people will shoot down your ideas, but you have to take the punches and persevere."



The Godzich family uses a Make Great Days bag in Colorado.

**→Jim Rohn:** Four Emotions That Can Change Your Life

# SUCCESS | FROM HOME

*FROM THE PUBLISHERS OF* SUCCESS *MAGAZINE*



# 5LINX
## Essential Products to Live a *Better Life*

## 'Culture of Giving' to Children

## A "Hi5" to Health
### Revolutionary, "Health-Inspired" Products for Nutrition and Wellness

## Network Marketing:
### Find the American Dream

$5.95
VOLUME 11 • ISSUE 1 • JANUARY 2015

5LINX Co-Founders Jeb Tyler, Craig Jerabeck and Jason Guck

# BUILDING MOMENTUM: Year-by-Yea





Founders Craig Jerabeck, Jeb Tyler and Jason Guck launch 5LINX. Initial service offerings of long distance, satellite TV and wireless.

5LINX launches its first video phone, the Packet 8.

5LINX builds its own Voice over IP telecommunications system, enabling it to launch GLOBALINX® VoIP service. The same year, it moves into its 50,000-square-foot world headquarters building in Rochester, N.Y. Ranked #338 on *Inc.*'s 500 list, #40 on Rochester Top 100.

Company name #274 *Inc.*'s 500 li Ranked on Rochest Top 10

**2001    2002    2003    2004    2005    2006    2007    2008    200**

5LINX has first National Training Event and promotes first Senior Vice President.

An enhanced compensation plan attracts energetic representatives and sets the stage for record growth.

Launch of 5LINX High Speed Internet.

Launch of 5LINX Mobile and 5LINX Security Systems. Ranked #336 on *Inc.* 500; #5 on Rochester Top 100.

5LINX promotes its first Platinum Seni Vice President and awards its first silver Bentley. Now 24 sales leaders drive one. Ranked #439 on *Inc.* 500; #3 on Rochester Top 100.







Inc.
5 0

TOP100

# aHighlights

5LINX begins offering energy services and launches TextAlertz, ChurchAlertz, Business Elite Services and 5LINX Payment Solutions. **Ranked on** *Inc.* **5000, #94 on Rochester Top 100.**



5LINX launches Velocity V2 tablet and expands 5LINX Energy.



GLOBALINX acquires national telecommunications company TMC communications. Launch of 5LINX Canada. Launch of GLOBALINX Mobile Video Apps and 5LINX ID Guard. Ranked on *Inc.* 5000; #14 on Rochester Top 100.

named 74 on 0 list. ed #2 nester 100.

## Spring

Launch of 5LINX High Speed Internet and Fiber Video, 5LINX SafeScore, Globalinx Mobi PrePaid Wireless, 5LINX enhancedcareMD℠ and MLSalertz; further expansion of 5LINX Energy.

## Summer

5LINX promotes four new PSVPs and is named to *DSN* Global 100 for second time. Ranked on *Inc.* 5000.

09 | 2010 | 2011 | 2012 | 2013 | 2014

**5LINX** | live a better life



5LINX reps generate $104 million in sales. Launch of 5LINX Velocity, 5LINX DataVault and 5LINX PowerPlay. It soars **into the** *Direct Selling News* Global Top 100 at No. 77. 5LINX ranked on *Inc.* 5000 and named the **fastest-growing company in it's hometown of Rochester, N.Y.**

## Spring
## Hi5

Hi5 products and $55,000 Hi5 Challenge launched. Tony Robbins highlights May Event, expansion of 5LINX enhancedcareMD, company rebranded logo.



## Winter

5LINX enters the nutrition market with MontaVida™ Coffee. Company shatters sales records

its enior nd

ow s ed 0; r





## Summer

PSVPs enjoy inaugural Platinum trip to Greece and Turkey. 5LINX named to *Inc.* 500/5000 for ninth straight year.

## Fall

5LINX adds **5LINX Fuel**, an energy shot, to its Nutrition line and launches 5LINX enhancedcareMD Smart Choice Bundle, enabling customers to find the best health insurance for them.

# EXHIBIT E

# A Gathering of Charitable Spirits

5LINX helps the needy, at-risk, sick and forgotten.

*by Beth Douglass Silcox*

**W**here 5LINX representatives gather, so, too, does a charitable spirit to help the needy, at-risk, sick and forgotten, and those who simply want to make the world better for themselves, their families and their communities.

5LINX weaves giving back tightly into their culture. "We teach our representatives that giving back is a normal part of business success. They need to give back to their communities," says Co-Founder, President and CEO Craig Jerabeck.

So 5LINX gives representatives simple ways to pay their blessings forward. Every 5LINX International Training Event benefits a philanthropic organization: getting kids off the streets and into safe environments, easing the pain of the West Webster Fire Department reeling from tragedy, sending Anaheim's childhood cancer survivors to camp or building a new wing of a local children's hospital.

At these International Training Events, seated with thousands of others in a convention center, representatives glimpse the true impact of their giving. In the years since Hurricane Katrina, 5LINX has gathered in New Orleans, and each time they find a way to help.

After a 5LINX gift to a local hospital to help fund treatment for uninsured children, Jerabeck says, "People from New Orleans got up on stage to tell their personal stories and I don't think there was a single eye in the place that was dry after listening to these people talk about what they have been going through since Katrina. So many people are still affected and many people in this country don't understand that."

Keeping his composure on stage can be tough, Jerabeck admits, but "they are on stage telling their stories because they feel so touched that there are people like us who will help." He and every 5LINX representative are proud philanthropy plays an important role in this business.

"Everybody feels better about themselves when they are helping others, and this business helps people do something positive that they otherwise wouldn't be able to do," Jerabeck says. "Many of our reps would not be in a position to be donating money to a charity were it not for their 5LINX side business. Many people get involved because they need extra money for school tuition or making payments at home, so we help in a big way in terms of providing the financial opportunity so they can give back in their communities."

The sentiment of giving back to the local community holds true on a corporate level as well. In addition to sponsoring golf outings, United Way campaigns and myriad other local funding and awareness campaigns, 5LINX steps out in a unique way to grow entrepreneurism in upstate New York.

Two years ago, 5LINX pledged $50,000 to Venture Jobs Foundation, a not-for-profit venture capital fund aimed at helping people start businesses in economically depressed areas of the greater Rochester, Buffalo and Syracuse areas.

"The money is given based on business plan and need. The money is granted and no repayment is expected," Jerabeck says. Unlike a for-profit venture capital fund, Venture Jobs Foundation is not looking for a return for profit. Instead, any returns outside the money lent goes back into the fund to create more jobs.

"We did this as a grant or a gift to help small businesses. Think about what we do for a living," Jerabeck says. "We create entrepreneurs and encourage the growth of entrepreneurship, so this is yet another way for us to live those values." **SfH**



# "This business helps people do something positive that they otherwise wouldn't be able to do."

—Craig Jerabeck, 5LINX Co-Founder, President and CEO





**➜Jim Rohn:** Four Emotions That Can Change Your Life

# SUCCESS | FROM HOME

FROM THE PUBLISHERS OF SUCCESS MAGAZINE



# 5LINX
## Essential Products to Live a *Better Life*

.................

## '*Culture of Giving*' to Children

.................

## A "Hi5" to Health
### Revolutionary, "Health-Inspired" Products for Nutrition and Wellness

.................

## Network Marketing:
### Find the American Dream

$5.95
**VOLUME 11 • ISSUE 1 • JANUARY 2015**

5LINX Co-Founders Jeb Tyler,
Craig Jerabeck and Jason Guck

# An Eye on Youth

**5LINX** inspires a culture of helping children.

by Beth Douglass Silcox

"Give up just one restaurant meal." This simple request made of thousands of 5LINX representatives at three International Training Events each year has a tremendous impact on the youth of host cities around the country. Funds raised during these events are matched by the company and reflects 5LINX' culture of giving. "We want to let all of our representatives understand that giving back is important, and if we work as a team we can make big things happen," says Co-Founder, CEO and President Craig Jerabeck.



An Eye on Youth



Since its founding in 2001, 5LINX has reached out to local charities in this way, usually with an eye on helping youth. Children's hospitals, a New Orleans medical center for people unable to get medical coverage, a center for missing and exploited kids in Las Vegas and many others have all received help from 5LINX.

"Before bringing our International Training Event into a market," Jerabeck says, "we ask our field for input and many times get great insight from leaders in the field as to what charitable organizations are doing a good job in the community."

By selecting charitable organizations that are important to the 5LINX representative base in those host markets, the company cultivates a sense of philanthropic pride among attendees who give. "People feel good when they give. There's no better feeling in the world than helping someone else," Jerabeck says. "Our job is not just to help people make money, but to help people improve themselves, whether that is helping them become better public speakers, better citizens or better leaders. Part of that is by understanding that we have obligations in our community to give back."

The real power of the 5LINX Opportunity lies not only in the ability to earn more money, but also in the choices available to representatives as a result of that extra income. "Having success and creating a successful lifestyle is really exciting, but it's really the power of what money can do," says Co-Founder and Executive Vice President of Sales Jason Guck. "Watching our field leaders take their wealth that they've created within the company and share it when there's a need is tremendous."

"We really have some very, very generous representatives. It's one thing to be able to make money, but when you can give back like ours do it's going above and beyond," Jerabeck says.

For some of the company's top money producers, giving at 5LINX International Training Events fuels a desire to do more. Several have expanded their charitable efforts and created their own foundations within their local communities. Some have been recognized nationally for the service they provide. "It's really been exciting to see the leadership within the company follow suit with what began at 5LINX events, and continue to keep giving and making an impact in their own communities," Guck says.

Beyond the International Training Event

> # "WATCHING OUR FIELD LEADERS TAKE THEIR WEALTH THAT THEY'VE CREATED WITHIN THE COMPANY AND SHARE IT WHEN THERE'S A NEED IS TREMENDOUS."
>
> —JASON GUCK,
> 5LINX CO-FOUNDER AND
> EXECUTIVE VICE PRESIDENT
> OF SALES

fundraising efforts, 5LINX corporate philanthropic efforts include hands-on projects like Habitat for Humanity, Toys for Tots, holiday baskets and food drives for kids and disadvantaged families, as well as assorted fundraising and awareness golf tournaments, runs, and walks across the country. 5LINX corporate employees and organizations like Safe Haven, a homeless housing program, and Dream Factory, dedicated to making the dreams of sick children come true, find support through cause-related giving campaigns through payroll deduction.

5LINX also supports the fundraising efforts of nonprofits through the LINX2Funds program. Vice President of North American Sales William Faucette, Jr. says, "We've created an entirely different and unique compensation plan that allows organizations to build businesses in 5LINX and get the residual benefit. That can be most significant to nonprofits, most notably in the faith-based community."

"Giving creates a responsibility, a sense of pride, and it makes you feel good to be part of an organization that's looking to constantly do what they can to better society and to better communities," Guck says. ∎

# EXHIBIT F

February 20, 2014, Contact: Press Office (518) 474-4015

# DiNapoli: Investment in Rochester Company Returns $6.7 Million to State Pension Fund

**In-State Private Equity Program Invests in New York State-Based Companies**

5LINX, a telecommunications company located in Rochester, has generated an estimated $6.7 million return, nearly four times the initial investment, and achieved an approximated 21 percent internal rate of return for the New York State Common Retirement Fund (Fund), New York State Comptroller Thomas P. DiNapoli announced today. The Fund invested in 5LINX through its In-State Private Equity Program, which seeks profitable investments in New York State-based companies.

"The success of the 5LINX investment is another example of how the In-State Private Equity Program delivers positive results for the Fund and for our local communities," said DiNapoli. "The program has successfully helped more than 250 companies remain and expand in the state and has supported nearly 4,000 jobs. The state public pension fund is investing in New York's future."

Trillium Group, a fund manager for the In-State Private Equity Program, received a $25 million commitment for venture capital funding in 2004. Trillium has made 14 investments in New York State-based companies, including 10 companies located in and around Rochester. 5LINX received $1 million in 2006, $600,000 in 2007 and $100,000 in 2009.

"5LINX represents another great example of what can happen when you connect a talented group of founders with private equity capital from New York State's Common Retirement Fund. 5LINX has gone on to experience significant growth and business success culminating in a return of capital to the Common Retirement Fund with a very attractive

rate of return. A win for all parties involved," said Chris O'Donnell, general partner for Trillium Group.

5LINX has operations in the United States and Canada. The company provides a range of telecommunications and other services for residential and business clients. The company, founded in 2001, was one of Inc. magazine's 500 fastest growing companies from 2006-2009. In 2012, 5LINX was named the 77th largest direct sales company in the world by Direct Selling News.

For more information on the program, visit: http://www.osc.state.ny.us/pension/instate/

## About the Common Retirement Fund
New York State Comptroller Thomas P. DiNapoli is trustee of the New York State Common Retirement Fund, the third largest public pension plan in the United States with more than one million members, retirees and beneficiaries from more than 3,000 state and local government employers. The Fund has a diversified portfolio of public and private equities, fixed income, real estate and alternative instruments and has consistently been ranked as one of the best managed and best funded plans in the nation. Over the past 20 years, 82 percent of the cost of benefit payments has been funded by investment returns. The Fund's fiscal year ends March 31, 2014.

## About Trillium Group, LLC
Trillium Group is a Rochester-based venture capital group with a primary focus on growth equity investment opportunities located in western New York. Trillium's current portfolio consists of more than 20 companies in a broad range of industry sectors and businesses. http://www.trillium-group.com/

###

Albany Phone: (518) 474-4015 Fax: (518) 473-8940
NYC Phone: (212) 383-1388 Fax: (212) 681-7677
Internet: www.osc.state.ny.us
E-Mail: press@osc.state.ny.us
Follow us on Twitter: @NYSComptroller
Like us on Facebook: www.facebook.com/nyscomptroller

# Trillium Group, state pension fund invest in 5Linx

By: Thomas Adams September 22, 2006

Henrietta telecommunications services provider 5Linx Enterprises Inc. this year has doubled its employment to 34 and expects to grow by another 75 percent as a result of a multimillion-dollar equity investment from the Trillium Group LLC and the New York State Common Retirement Fund.

"We're hiring right now," 5Linx president and CEO Craig Jerabeck said Wednesday. "We're in the process of hiring six full-time people. We expect by the end of the October to have a full-time head count of 42."

The amount of the investment was not disclosed. The Trillium portion comes from its Lakefront Partners III Fund, which typically makes investments ranging from $2 million to $5 million.

"It allows us to build our own infrastructure," Jerabeck said of the infusion of capital. "We're buying our own switching equipment. It allows us to grow the business and, in essence, become a telephone company. We're becoming our own VOIP provider."

The company sells telecom products and services, with an emphasis on voice over Internet protocol, to residential customers and small to midsize businesses worldwide. It uses an independent sales staff of 10,000 to market its products and has 100,000 residential and business customers in the United States and eight other countries, Jerabeck said.

"Their direct sales model sets 5Linx apart from its competition," Trillium general partner Christopher O'Donnell said in a statement. "The company benefits significantly from an independent, entrepreneurial sales force. Such independent representatives are operating their own businesses with product, marketing and customer service provided by 5Linx."

The company was founded in 2000 and started doing business in March 2001. "Our sales are growing dramatically," Jerabeck said. "It's just five years of grinding it out." A key moment for 5Linx may have come in March 2005 when the company increased its focus on VOIP, Jerabeck said.

"That was really a turning point for our sales force and for our company (because) we had a solid direction and a solid product line to go forward with," he said.

The company has increased its office space here to 11,000 square feet, from 7,500 square feet, by adding a 32-seat customer service center that will be installed next week. It is scouting potential locations in Atlanta for a field office, Jerabeck said.

This month 5Linx joined Inc. magazine's list of the 500 fastest-growing private U.S. companies. It is ranked 338th.

"We think next year at this time we'll be somewhere in the neighborhood of 60 employees," Jerabeck said.

The investment from Trillium Lakefront Partners is its seventh, the fourth to a Rochester-area company. The state retirement fund is the largest single investor in the Lakefront Partners fund.

Previous Lakefront Partners investments were made to:
— AccuMED Technologies Inc. of Buffalo in July;
— Accu-Dyne Inc., a Rochester sheet metal components and fabrication firm, in May;
— Auction Direct USA, a pre-owned vehicle seller in Victor, in April;
— Election Services Corp., a Long Island election software and services company, in August 2005;
— Northern Safety Co., a safety and industrial supply firm in Utica, in June 2005; and
— E-chx Inc., a payroll processor in Brighton in December 2004.

The Common Retirement Fund, the second-largest public pension fund in the United States, is administered by state Comptroller Alan Hevesi. It has assets of $120 billion, including its $364 million in-state investment program.

"Investing in New York State companies such as 5Linx is one of the best ways to earn a competitive return for the state's pension fund and to help these companies to grow throughout New York State and beyond," Hevesi said in a statement.

(rbj@rbj.net / 585-546-8303)
09/22/06 (C) Rochester Business Journal